5 p.m., Wednesday, October 18, 2011 for the appellant, ABB. As a preliminary matter, your honors, before I turn to the district court's order in this matter that precipitated the appeal, I want to apprise the court that as we informed the clerk last week, we did reach settlement in principle with regard to one of the appellees. That's Johan Herman Francken. He's abbreviated in the brief as Hans Francken. Please report that yesterday the final settlement term was met. We'll be reporting solely as to the issues with regards to Hans Francken this afternoon. So I believe that just eliminates one issue unique to Hans Francken which was... Does that affect anything with regard to the allegations of conspiracy in the company? No, your honor, it doesn't. I mean, the fact remains that there was a conspiracy with regard to the three entities of Turbo USA, Willem Francken, and Hans Francken, and those conspiracy allegations still remain. The settlement doesn't remove the allegations. It just eliminates our ability to proceed separately against Hans Francken on those. So turning to the district court's order that precipitated this appeal, your honors, we submit that in dismissing ABB's allegations of trade secret misappropriation, the district court committed three errors of law that warrant reversal. Firstly, with regard to the district court's two primary bases for dismissing ABB's complaint, those concern the issues of statute of limitations and the measures that were taken by ABB to protect its trade secrets. Now those are two highly fact-specific inquiries, and on both, at the pleading stage, the district court judge misapplied or mischaracterized the allegations in our complaint, and the basis of those mischaracterized allegations preceded them to draw inferences adverse to ABB. And then furthermore, compounding that error, the district court then misapplied the law to conclude that there was no basis on which ABB could proceed with its claims and seek discovery. Now the third issue concerns the Twombly-Iqbal pleading sufficiency points. That was addressed in a footnote in the district court's order. The entirety of the district court's evaluation of our extensive complaint with regard to the trade secret issues was that those allegations were, quote, vague and devoid of dates, facts, and specifics, close quote. On the specifics, what does the complaint detail about the content of the alleged trade secret? That is detailed in paragraph 32 of our complaint, and it specifies five particular categories of trade secret information, really the types of trade secret information that is customary and traditional for the type of engineering operations that are at issue here. So, for instance, in paragraph 32, Romanet 1 discusses assembly and production drawings, models and other schematics, and it goes on. Romanet 2 refers to manufacturing and working instructions. Romanet 3, training and other instruction manuals. Romanet 4, detailed information on and specifications about the actual delivered turbocharger products. So, ABB maintains a database that correlates the products that is delivered to the customers that receive them. That actually is material information if you're in the business of servicing, for example, a turbocharger that is located in an ocean-going vessel, where if that vessel is making port and requires service, the party that's actually rendering the service needs to understand what particulars of that turbocharger are. You all knew that ABB Turbo was in this business, right? That TurboNED and TurboUSA were in the business of repairing these machines. That's correct. So, you just said, I think, that in order to do that, they needed this information. In order to do that in a way that would make their services more attractive and enhance their ability to compete with my clients, that is a beneficial piece of information that would be very useful to a competitor. You could, of course, wait until the vessel makes port, go in and inspect it and decide what components are necessary. So, I might have spoke a little bit too precisely when I said it would be needed. Right, but it goes to a theme of the district court's ruling that it would be beneficial to have a secret. It's hard to believe you didn't know that they had a bunch of information, and until you have specified the things you consider secret, it's hard to know that there is a plausible narrative here that they had something that they shouldn't have had, given that you knew they were in this business. I think the issue, Your Honor, is one could be in this business without misappropriating trade secrets. There's nothing internally inconsistent about that, and that's essentially the conundrum that the district court believed to exist, that one has to be privy to the information that it contends to be trade secret information in order even to exist in this space, and that simply is not the case. It is possible for somebody to compete honestly and without the basis of misappropriated trade secrets. So, merely the presence of another competitor in this market isn't enough to trigger the belief that somebody has misappropriated trade secrets, and I would submit that if we were proceeding on the basis of that alone, we would certainly hear that our allegations are far too speculative to satisfy Twombly-Iqbal. Doesn't that support the trial judge's concern about the amount of detail in the complaint? The trial judge actually, Your Honor, never identified with any real particularity what he found to be defective about the level of detail concerning our trade secret allegations. But he told you the problem was the absence of particularity. Is the burden on him to rewrite your complaint? Absolutely not, Your Honor. But we would submit that where a district court judge is making an assessment that pleadings fail to satisfy Twombly and Iqbal, that it is incumbent upon the district court judge to identify what elements of the cause of action we have supposedly failed to meet. I mean, that would, for example, give us the opportunity to approach the district court and seek leave to amend. Here, there was simply no guidance. I mean, we have paragraphs upon paragraphs of allegations about the trade secret misappropriation that, for example, begin with allegations of cash being paid in a parking garage in Zurich, Switzerland in exchange for ABB trade secret information. This is the quintessential case of misappropriation where a former employee departs a company to then engage in competition with his former employer. He knows whom to call, and he calls them, and he offers them money in exchange for the secrets. But the district court doesn't have those details. Well, we allege them in our complaint in detail about parking garages in Zurich, Switzerland in paragraphs 70 through 82, for example. So this is, again, a classic situation, Your Honors, of a party with specific inside information. Having been employed by my client for 17 years, he knows where to go for his information. It doesn't mention names. I'm looking at 73. The court did appear to be concerned about the generality even of these allegations. Well, we would submit, Your Honor, that there's nothing under Eleventh Circuit law or any other court that we've seen that would even suggest that the level of precision that we have laid out here is insufficient to satisfy Twombly Iqbal. Twombly Iqbal is not a standard of probability. It's a standard of plausibility. And having recited allegations that must be obtained trade secret information from an individual at our client, where efforts were then made to cover the tracks of that whole effort where people didn't use email, at least not in these initial contacts, these were done as face-to-face exchanges where cash and money was exchanged for ABB's trade secret information, all as alleged in paragraphs 75 through 81 and 82. Can I return to, I think we're actually all talking about exactly the same issue. Their line of work encompassed what? So ABB or, I'm sorry, so TurboNet and TurboUSA were involved, TurboNet formally was involved in both producing parts for turbochargers. Producing parts as well as servicing. As well as servicing, Your Honor, yes. So one concrete aspect of the paragraph 32 enumeration is about parts prices? So for example, Romanet 1 goes to the issue of parts and the ability to reproduce parts. And Romanet 5. And Romanet 5 goes to price list as well, so the ability to effectively compete with my client because you know what they're charging. Yes, so sort of both the manufacturing capability and then the commercial ability to compete in 1 and 5. So and then the others, for example, the other aspect of the business for both TurboNet and TurboUSA was servicing turbochargers. And so, for example, Romanet 2 refers to information for disassembly and reassembly of our turbochargers. These are complex devices. Those details about how somebody is to go ahead and service a turbocharger is also a trade secret that's plainly alleged. And is it, I should know this by now, but AbbTurbo, was it also in the business of servicing and providing replacement parts? Yes, Your Honor. They would manufacture their own OEM parts, of course, using their own internal trade secrets, and then they would service vessels on the basis of those parts. So we're left here with allegations that both from the perspective of the initial acquisition of the trade secrets all the way to the use today of the trade secrets are amply supported by the allegations and the complaint. And with regard to this, the whole Twombly-Iqbal sufficiency of our allegations, I would submit that it is notable that it was neither the primary nor the alternative grounds on which our complaint was dismissed. I do understand there was a footnote that did make reference to Twombly-Iqbal. But the fundamental issues on which our complaint was dismissed were, number one, statute of  We had a judge who drew inferences that were adverse to ABB. The district court said, well, on the scope of these allegations, it must be the case, I'm paraphrasing here, that ABB must have had an inkling, that was the judge's word, an inkling that something was amiss. Well, that's not the standard for triggering the duty of diligence under the statute of limitations. That's not something that would put us reasonably on notice. But more than that, that's plainly an instance where the district court judge, with all respect, drew an inference that is adverse to us. The inference that is most reasonable to draw on the basis of our allegations is that TurboNED and Hans Franken took steps to cover their tracks, and they were good at it. They were effective at it. They did things in such a way that they would be untraceable. And so those allegations from the four corners of the complaint, there is absolutely nothing that would show that the statute of limitations began to run three years before the complaint was filed. On that issue, the district court judge makes no findings even as to when the statute allegedly began to run. He just simply says, well, the allegations are so widespread that it must have triggered at least an inkling. Secondly, with regard to the alternative ground on which the district court dismissed the action, that was on the sufficiency of the measures taken by ABB to protect its trade secrets. And in that regard, the district court judge actually made a finding or drew an inference, either one, that is directly contrary to the expressed allegations in the complaint. Paragraph 35 of the complaint says that ABB used all of the time-honored and widely and widely used techniques to protect its trade secrets. The law is clear that just because there's been a breach of those protections certainly doesn't mean that we had no reasonable protections. That would defeat the ability to pursue trade secret claims in every case. The law doesn't say that. The law says your measures need to be reasonable. And our measures, as alleged, have been found by multiple courts after full discovery and after trial to be sufficient measures to constitute reasonable protections. And the district court judge said, well, it must be the case, or as the appellees call it, a pleading dichotomy. Either you didn't have sufficient protections in place, in which case you fail that aspect of the trade secret claim, or you had sufficient protections in place and they failed to alert you to the ongoing... Let me interrupt. I know you're out of time, but your opponent makes a large point out of the fact that at this stage, after the concerns of the district court were made known, you didn't move accompanied by an amended complaint to respond to the trial court's concerns. That seems to be an interesting and strong argument. What's the answer to that? There are issues, Your Honor, with regard to the three different bases on which the district court dismissed our claims. The first, with regard to statute of limitations, we submit that the law is clear that there's nothing on the face of the complaint that would show that the statute began to run at any point in time. And thus, there's nothing else to amend to add. Moreover, our complaint also recites all of the responses to defeat that affirmative defense. In other words, the act of concealment is already in the complaint. So we would submit that nothing would need to be added to address the statute of limitations concerns that the district court raised. With regard to the measures that we took to protect our trade secrets, which was this alternative basis, again, there too, the measures that we have alleged to be sufficient protection have been found after full bench trials in cases to be sufficient. So there too, we would contend there's really nothing more to be said. That brings me to the third issue, which is the passing reference made in footnote six to Twombly and Iqbal, where the district court simply did not tell us, I'm not saying the district court was obligated to, but in order to amend, given the extensive allegations over dozens and dozens of paragraphs, we had no insight at all into what we could say that would help address some of the district court's pleadings concern. And so there was just simply no basis on which we thought we could really effectively move to amend to address the district court's concerns. All right. It does seem, going through all of this exercise with an appeal and all else, that at least some offer, some proffer of additional details to say that the burden is on the district court to rewrite the complaint and say, fill in these gaps seems unrelated to Twombly and Iqbal. Perhaps I could give an illustration. In the briefing that accompanied the motions to dismiss, for example, we explained a bit more about the timing at which we discovered the widespread ... Well, that relates to the statute of limitations. That's right. The court seemed concerned about the substance of the generality of the allegations. In our gray brief, Your Honor, we go through each of the elements of the cause of action and in our opening brief as well, in our blue brief. For every one of those, we identify case authority that shows that the scope of our allegations are sufficient. There is no requirement, there's no heightened pleading requirement imposed on trade secret plaintiffs. It is measured under Rule 8, not Rule 9. So for every one of these, we looked at the case law, Your Honor, and we couldn't find a case that would say to us that we fell short in any one of the elements of the cause of action of trade secret misappropriation under Florida law. And so where we did that research and where we didn't see any identification of a deficiency, we really did come away without really any understanding as to what more we would do. And we've spelled that out. I mean, there are cases that deal with the issues that appellees have raised on appeal. And we would submit that, I mean, appellees' position, Your Honor, is tantamount to the case on summary judgment or on JMAW. No case says that we need to provide all manner of factual specificity that underlies our factual allegations. We don't need to attach an expert declaration, for example, to make a verified complaint. Our factual allegations have been accepted by other courts as being sufficient. And so it left us, really, with no place else to go on the issue of the sufficiency of our misappropriation claims. Yes. Well, the only place left to go is here, and the delay and cost and all else of an appeal. And I understood. Substantively, we didn't know what more to add. Maybe it would have been a better way for me to say that. Okay. Okay. We've gone way over, so we'll restore two minutes of rebuttal time for you, which puts us about six minutes over, so we'll add six minutes to the other side time to keep it even if you need it. Thank you. Good morning, Your Honor. May it please the Court? My name is John Peltz. You're here today representing TurboUSA and Willem Franken. The settlements that have occurred leading up to this point allow us to do quite a bit of focusing here, which I don't think really occurred during my colleague's argument. We've eliminated the patent claims. We've eliminated all claims against TurboMed. We've eliminated all claims against Tons Franken. Frankly, a great deal of the discussion that I heard during oral argument, particularly in response to some of Judge Newman's questions, we're getting into what I would call the saltier facts that they have alleged with respect to the meeting in Zurich parking garages and whatnot, that these allegations are generally contained in the complaint at paragraph 70 through 93, but I would point out that all of those allegations relate to Hans Franken and TurboMed. They do not relate to my clients. Well, they might relate to your client on an issue that the district judge did not address, but that you ask us to decide anyway, which is a question of knowledge of improper means, but the district court did not address that. Those allegations could, in fact, a number of the saltier allegations could relate to the question of knowledge, in particular TurboUSA's cooperation with Hans in what the complaint suggests was a not entirely above board effort to secure Hans' payment after the Netherlands company was sold. Those allegations are with respect to whether Hans was manipulating payments to TurboMed. If anything, that suggests maybe that TurboMed might have a claim or its new owners might have a claim against Hans, but they don't have anything to do with the acquisition of these trade secrets. Those paragraphs, and again, they are 70 to 93, I commend them to you. Well, guilty knowledge might, in fact, under the quite low Rule 401 standard for relevance, be transferable from one kind of misconduct to another. In this instance, Your Honor, they would be separated by decades. The acquisition of these trade secrets 20 to 30 years ago and then Hans allegedly manipulating how much money TurboUSA overpaid to TurboMed for the sake of getting money back, frankly, it sounds to me like a zero-sum game. They haven't alleged any more than that, but in assuming there's something wrongful in TurboUSA overpaying TurboMed for parts, it has nothing to do logically or factually with the acquisition of these trade secrets 20 to 30 years previously. There's nothing in the four corners of this complaint that suggests that Willem at all participated in that acquisition or that Willem knew about it later. It's not just Willem, right? It's TurboUSA. There are two defendants, and the corporate one was using them and is at least alleged to have been part of the alleged scheme to secure Hans his post-sale money. That much is correct, Your Honor, in that five or six-paragraph section that talks about that price manipulation between TurboUSA and TurboMed, but again, there's no correlation between that alleged price manipulation, which had to do with the asset purchase or a stock purchase, whatever the agreement was by which Hans disposed of TurboMed. There's no correlation factually or logically between that and knowledge of these particular trade secrets. In fact, for all we know, these price manipulations may have been with products that are completely divorced from anything having to do with ABB or its turbochargers. There's nothing alleged in this complaint to say that they were, so there is no connection to be drawn there to pull in TurboUSA or Willem. So among the saltier, to use your word, allegations is the Zurich Hotel allegation. Yes, Your Honor. Putting to one side the sufficient or insufficient specificity of paragraph 32 of the complaint, why isn't that allegation, I guess I won't say enough, but why doesn't it in fact bear on whether there was improper means? And I'm putting completely to one side here the question of the domestic Willem and TurboUSA's knowledge of it, which was not a ground on which the district court relied. So let's assume they knew everything that Hans knew because that was not a ground of the district court's dismissal. Why is it not in fact relevant to the question whether there was an acquisition of information by improper means that some of this was done by cash in a garage? That is what the district court found to be lacking in sufficient particularity, and Your Honor, I would have to respectfully disagree. I believe that finding a lack of sufficient particularity includes all the elements of the claim, which the individual knowledge of TurboUSA and Willem is an important part of the elements of the claim against those two defendants, my two clients. So while the district court may not have gone and did not go, frankly, item by item through each of the elements of the causes of action that say there's a lack of particularity as to this one to this one to this one and the next one, it did say that the complaint was generally lacking that particularity. Again, did not take the ABB to school and explain to them exactly how their complaint was sufficient and how it could be repaired, but did address that lack of sufficient particularity. And so I think we have to look at what is actually alleged here. There is no allegation in these five or six paragraphs about the price manipulation that says that that price manipulation somehow conveyed or evidenced knowledge on the part of TurboUSA. Okay, we'll focus just on paragraph 32. Why is that not sufficient at the pleading stage to allege that there were trade secrets there? 32 is alleging the existence of those trade secrets. This isn't anything about the garage or the envelope full of money or anything like that. But yes, that is, and this is repeated in a later paragraph almost verbatim later in the complaint, where they do attempt to identify the trade secrets. If we talk about that identification, the Florida courts and the 11th Circuit in particular has been extremely strict in its application of Quambly-Iqbal, and I commended to this both of which are 11th Circuit cases, where they held the parties to a very high standard of factual pleading in order to state a cause of action. Now, neither one of these were trade secret cases. I'm not suggesting they were. Have you indicated that the plaintiff here knows more about the details of the acquired trade secrets than it has pled? Dramatically more, Your Honor. They list, in fact, seven different witnesses who they say would testify in this and then fail to tell us what any one of those seven witnesses would say. And so, yes, they probably could fill volumes with what they know about this supposed trade secret theft and what was contained in the trade secrets. What they have not alleged, and I think it's because they cannot allege, is that we have no evidence that Willem or Turbo USA were involved in that acquisition or knew about it. Now, in their grave brief, they have isolated down to eight paragraphs out of this complaint that they would like this court to look to, to say this is where we allege that Turbo USA and Willem had the requisite guilty knowledge for a Florida trade secret claim. Those are paragraphs 109 and 110, from which they pull out the allegations that Turbo USA acquired the trade secrets and could not reverse engineer them. Neither one of those factors that they pull out on page 16 of their brief really addresses the knowledge that these trade secrets were obtained illicitly. It merely says that they had them and that they couldn't reverse engineer them. We'll get to the reverse engineering later. But neither one of those really say that Willem or Turbo USA knew these were improperly obtained. Then in paragraphs 63 and 64, they pull out from those two paragraphs a general allegation that Willem was familiar with Turbo USA, excuse me, with ABB's business. Again, there's nothing in that that says that Willem or Turbo USA knew that these trade secrets were illicitly obtained. They allege in paragraph 35 that the documents were marked as trade secret at the time they were stolen by ABB's employees from ABB and then sold to Turbonet. What they leave out is 60 paragraphs later, they allege that Turbonet removed those markings from those documents and now they're in Turbo USA's hands without those markings. So again, that shows nothing of Turbo USA's or Willem's knowledge. Finally, they allege in paragraphs 94, 111, and 112, some of the most broad and Paragraph 94 was, upon information and belief, Willem Franken was knowledgeable of, or participated in the procurement of ABB's turbocharger trade secrets from ABB. What paragraph were you just referring to? That is 94, Your Honor. It's on page 17 of the font. I didn't write the appendix page down. Paragraphs 111 and 112 are equally conclusory. Paragraph 111 is, upon information and belief, Hans Franken and Willem Franken also obtained ABB's turbocharger trade secrets from ABB employees located in Florida. 112 is virtually identical, except now they substitute Turbonet and Turbo USA for Hans and Willem as having received these trade secrets in Florida. These are the classic conclusory allegations that are mere recitations of the elements of the cause of action that were condemned in Iqbal. They are indistinguishable from the allegation that the Attorney General was the principal architect of this policy that was being challenged or that the FBI director was instrumental in implementing it. Those kinds of blanket, formulaic allegations are exactly what caused the court, and probably in Iqbal, to heighten the pleading standards. You don't think that the knowledge allegations in Iqbal, the judgment of their insufficiency was influenced by the particular context there? Perhaps they were, Your Honor. What is the ordinary course post-Iqbal for what must be tens of thousands of complaints alleging intent or knowledge? The Mamani case from the 11th Circuit, I think, gives us a guideline. It says the first thing you do when you're judging the sufficiency of a complaint like this is you go through the complaint and you virtually strike every pleading that is the elements of the cause of action. And that is exactly what these paragraphs, 94, 111, and 112, would be stricken in that first go-through with Mamani. They'd be out of this case. And so if you just take the eight paragraphs that ABB has identified as being the ones that are the best paragraphs for showing Willem and Turbo USA's knowledge, they in fact are woefully deficient under Qanbi Iqbal. And the district court was entirely correct in dismissing this complaint for lack of particularity because, again, you can read paragraph upon paragraph of formulaic recitation and conclusion. It is not an allegation of a fact from which it can be inferred that Willem and Turbo USA had knowledge. When you referred a little while ago to how the plaintiff had seven witnesses, what do you mean by had seven witnesses, if that was your language? Is that stated in the complaint? Yes, it is, Your Honor. They list them by name in the complaint, these seven individuals who were allegedly former TurboNet employees who they say would testify. But then again, they don't provide us with any information that these gentlemen or ladies would provide. Now, another thing that the query brief completely failed to address are the allegations within this complaint that directly contradict any inference that Willem and Turbo USA had knowledge that this information was illicitly obtained. ABB affirmatively alleges in their complaint that Turbo USA on its website advertised the world, certainly to the people in the turbocharger market and turbocharger universe, that they had this information and they had these capabilities. Under Eleventh Circuit case law... Okay, what are you referring to now? Those allegations, Your Honor, are in pages, it's in the appendix of 365, paragraphs 58 through 62. In the Eleventh Circuit, it is appropriate for the district court to look to those allegations to say the inferences I can draw from that contradict the essential elements of the cause of action and therefore the case should be dismissed. That's the Edwards versus Prime case and the Rahab versus Englewood case where in those cases the plaintiff affirmatively alleged within their complaint facts which gave rise to an inference that was contrary to the law. Contrary to an essential element of their cause of action. Do these allegations say when the Turbo USA's webpage disclosed that Turbo USA had all this information? So if it was within the statute of limitations period, that wouldn't be harmful to them, would it? Judge, to be clear... I'm sorry. No, please, go ahead. If you're going to the issue of the statute of limitations, depending upon when it occurred, it may either hurt them or help them on whether or not they knew about it or should have known about it within the three years prior since they don't actually allege a date. But here we're talking not about that aspect of the case, we're talking about Willem's guilty knowledge. And Willem, if he had guilty knowledge, would not be trumpeting it to the world saying I've this information which is illicitly obtained but allows me to service your turbochargers. Just on this particular paragraph, you're telling us that because they advertised they had a website that contains, without identifying the information that contains, it says part specifications, that that's adequate. Well, it is ABB who has alleged that those parts and specifications were included, the trade secrets that were... It doesn't say what the specifications are, right? It does not say, but it is ABB's conclusion that it was the trade secrets that they allege were misappropriated. That's to give you the precise line within those six paragraphs, but it's among those six paragraphs that it was ABB's conclusion that what was being advertised here on the website were the very trade secrets that they allege were misappropriated. So, again, that kind of inference directly contradicts any inference that Willem and TurboUSA had the requisite guilty knowledge and therefore, under the 11th Circuit practice in case law, can be looked to the district court to determine whether the complaint is sufficient. And you're saying that that would affect anything that might have been improperly transferred, whether or not it was on the website? If, in fact, it was something that Willem and TurboUSA were advertising that they had, they would not... Again, they would not be advertising it if they thought that it was illicit for them to have it or that they had obtained it illicitly. They would simply go out and use the practices to compete more efficiently and get their benefit that way. But by advertising it to the world, they are essentially demonstrating that they have no they shouldn't have, that they need to be hiding it somehow in order to protect themselves from this kind of litigation. So, the other thing that needs to be addressed in terms of knowledge here is the way the allegations are laid out in the complaint. TurboUSA is, in fact, a downstream user of information that was stolen first by ABB's and then transferred to TurboUSA. Under the Liberty American Insurance case that we discussed in the red brief, the downstream user is not assumed to have knowledge that the information that is being used by the downstream user or for the downstream user was illicitly obtained. And, in fact, the mere fact that the thief and the beneficiary in that case, the downstream user, were good friends and were both out of financial interest in the success of the downstream user was not enough to impute knowledge to that downstream user for the purpose of a misappropriation claim. The thief was held liable. The downstream user was not. Can I just follow up on something? Your seven witnesses, this is paragraphs 86 to 92, I trust. Those are the people listed. There are seven of them. Right. Are those people that ABB Turbo has access to right now? TurboMed or TurboUSA? When we first talked about, when I asked you some questions to which you responded about the seven witnesses, I took your answer to be suggesting that these were people that the plaintiff had access to, has access to, can get information from, and could therefore have filled an amended complaint or a second amended complaint with many, many details based on those discussions with the seven witnesses. So my question is, are these seven people people that plaintiff has access to to download everything in their heads? I assume that they do, Your Honor. The reason I say that is because they allege that they found out about all this from TurboMed and all of these people, these seven people, are alleged to be TurboMed employees. And while they don't come out and say in their brief, which is somewhat true to form, they don't come out and say that they do or do not have access to these individuals, but I would infer from those facts and circumstances that they do. Now, briefly on the question of the statute of limitations, the district court really expressed a certain amount of disbelief and frustration that a massive theft of trade secrets like these occurring over a space of 20 to 30 years could go undiscovered until actually after this litigation was filed. They claim they didn't learn about it until after the litigation was initially filed. That, you know, this is a theft by some kind of senior or trusted employee at ABB, someone who either had legitimate access to the trade secrets or was able to get it illegitimately because of their position. But in that respect, somehow a senior or trusted employee, this isn't alleged. And it's being used against ABB daily in competition in this very closed market and that somehow ABB didn't know about it or discover it. The district court was quite correct in being concerned about those allegations. I see I'm out of time. I would just ask you to affirm. Thank you. Your Honor, the issue here is plausibility, not probability. And the allegations in this case are replete with illustrations of actual egregious misappropriation by people, including Hans Franken. We allege in paragraph 94 that his son, Willem, knew of or participated in that misappropriation. We allege without dispute that Turbo USA, one of the remaining affilies in this matter, was operated as the alter ego and instrumentality of Hans Franken. That's the significance of the price manipulation allegations. They're one in the same. Turbo USA's actions are, excuse me, Hans Franken's actions are therefore chargeable to Turbo USA. And it is inconceivable, frankly, that Hans Franken, having set up Turbo Ned in the Netherlands to compete specifically with companies including my client and having sold Turbo Ned and founded Turbo USA, of which he is the 100% owner through another company and which his son is the president of and is engaging in exactly the same business operations, is not following exactly the same course of conduct that he followed in the Netherlands. He is out of the business in Holland. He is in the business in Florida. And it is more than plausible for us to assert that he is engaging and his company, now Turbo USA, and his son, Willem Franken, are engaging in the exact same misuse of our information. And it's inconceivable for Turbo USA and Willem Franken to suggest that they are the innocent downstream recipients of this information. This is not an arm's length transaction. These are not unrelated companies. These companies and their operations are about as related and interlinked as it comes. The one case that they cite to suggest that that chain is somehow broken because these are formally separate parties, Liberty Insurance, that was a case for preliminary injunction, not a pleadings case. That's the one case that they direct you to. It was a case for preliminary injunction where there was record evidence from the parties in that case saying, no, I didn't take the trade secrets from the company that I left. It's very simple here. It is a classic illustration of a former employee using knowledge gained both before and after he left his company's employ in order to operate an ongoing business. And the suggestion that that ongoing business has no knowledge of this information is not only implausible, our allegation that they do plainly meets the plausibility standard set out in Iqbal, and we respectfully request that it be resolved. Can I just ask you the question about the seven witnesses? Yes, sir. Do you have access to them? We have spoken with one of them, Mr. Dreyer, and the other information that we have is information that we've obtained from him. So the short answer to your question is, no, these are not employees of my clients. We would anticipate needing to seek discovery through the Hague of these individuals. But we felt, I mean, these allegations included Hans Francken and Turbo Ned, and so we didn't want to be accused of, they're saying that these were unduly generalized allegations. And so the people who really matter, if they want to, if they think that they're not on notice despite the paragraphs upon paragraphs of our allegations as to what our claims are, they have far better access to these people than we do. I believe these are people that Hans Francken actually worked with at Turbo Ned. So, you know, to the suggestion from my brother that we've sort of held back on information, we've gone the other direction, Your Honors. We have tried to, you know, tell a sequence of events that leads inexorably to the conclusion that they are improperly trading on our information and they knowingly acquired it. And their best excuse is, well, this was an atypical business transaction where we acquired information on the garage. That's their excuse to explain the genesis and the provenance of the information that they built their business around. And at the pleading stage, at the pleading stage, what we've alleged is plainly sufficient and we should be permitted the opportunity to take discovery of our allegations. Thank you. Thank you, Your Honors. Thank you, Your Honor.